UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NEIL ROGERS, | CASE NO. C11-1689JLR |
| Plaintiff, | ORDER ON DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT AND TO STRIKE |
| v. | |
| JPMORGAN CHASE BANK, N.A., | |
| Defendant. | |

## I.    INTRODUCTION

This matter comes before the court on Defendant JPMorgan Chase Bank, N.A.'s ("Chase") motion for summary judgment.  (Mot. (Dkt. # 21).)  In Chase's reply brief in support of its motion, Chase also moves to strike (Reply (Dkt. # 27) at 2) *pro se* Plaintiff Neil Rogers's untimely response to Chase's motion (Resp. (Dkt. # 26)).  Having considered the submissions of the parties, the balance of the record, and the relevant law, and neither party having requested oral argument, the court DENIES Chase's motion to

strike (Dkt. # 27) and GRANTS in part and DENIES in part Chase's motion for summary judgment (Dkt. # 21).

## II.     BACKGROUND

### A.  The Washington Mutual Account

On January 5, 2007, a customer opened a consumer checking account ("the Account") with Washington Mutual ("WaMu") in Chicago, Illinois under Plaintiff Neil Rogers's name and social security number, listing an address in Chicago and a Georgia driver's license number.  (Baydid Decl. (Dkt. # 23) ¶ 6, Ex. A at 12.)  Pursuant to records maintained by WaMu that were transferred to and are currently in the possession and/or control of Chase ("the WaMu Records"), the initial (and sole) deposit into the Account was a check for $36,400.00 issued by Robert W. Peterson ("the Check") and drawn on an account at Fifth Third Bank.  (*Id.* ¶ 6.)

Shortly after the account was opened, Fifth Third Bank reported that the Check was counterfeit and sought recovery of the funds deposited in the Account.  (*See id.*) According to the WaMu Records, WaMu notified the holder of the Account by a letter addressed to Neil Rogers at the Chicago address, which informed him that all remaining funds would be debited, the balance reduced to zero, and the Account closed.  (*See id.*) WaMu closed the Account effective as of January 12, 2007.  (*Id.*)  The WaMu Records indicate that following an investigation WaMu reported the Account to ChexSystems, Inc. ("ChexSystems") as "Suspected Fraud Activity" ("SFA") on or about April 20, 2007. (*See id.*)  There is no dispute that ChexSystems is a credit reporting agency ("CRA") within the meaning of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*

1       During this time, Mr. Rogers, the plaintiff, maintained a consumer checking

2   account with WaMu, which was opened in Kent, Washington in 2005.  (1st Anderson

3   Decl. (Dkt. # 22) Ex. A ("Rogers Dep.") at 14-15.)

4   **B.  Chase's Acquisition of Washington Mutual Assets**

5       On September 25, 2008, the Office of Thrift Supervision declared WaMu

6   insolvent and appointed the Federal Deposit Insurance Corporation ("FDIC") as Receiver

7   of WaMu pursuant to 12 U.S.C. § 1821(c)(3)(A).  On the same date, the FDIC and Chase

8   entered into an agreement ("the Agreement") whereby Chase purchased certain WaMu

9   assets and liabilities.  (*See generally* 1st Anderson Decl. Ex. I ("Agreement").)[1]  In

10  addition to assuming WaMu's liabilities and purchasing WaMu's assets as set forth in

11  Articles II and III of the Agreement, Chase agreed to "have the primary responsibility to

12  respond to subpoenas, discovery requests, and other similar official inquiries with respect

13  to the Records of which it has custody."  (*Id.* § 6.3.)  The Agreement defines a "record"

14  as "any document microfiche, microfilm and computer records . . . of [WaMu] generated

15  or maintained by [WaMu] that is owned by or in the possession of the Receiver at Bank

16  Closing."  (*Id.* Art. I at 6.)

17  **C.  Mr. Rogers's 2010 Inquiries to Chase Regarding the Account**

18      On January 25, 2010, Mr. Rogers sought to refinance his mortgage with Wells

19  Fargo Bank, at which point he learned of a ChexSystems SFA report by WaMu

20  _____

21      [1]  This court has previously taken judicial notice of the Agreement and does so again
    here. *Tonseth v. WaMu Equity Plus*, No. C11-1359JLR, 2012 WL 37406 at *1 n.2 (W.D. Wash.
    Jan. 9, 2012); *Danilyuk v. JP Morgan Chase Bank, N.A.*, No. C10-0712JLR, 2010 WL 2679843,
22  at *3 (W.D. Wash. July 2, 2010).

associated with his social security number. (*See* Rogers Dep. at 19.) On February 5, 2010, Mr. Rogers visited a Chase branch in Kent ("the Benson Center Branch") and inquired with Liana Baydid, the Benson Center Branch Manager, regarding WaMu's SFA designation. (Baydid Decl. ¶ 5.) Because Mr. Rogers was a current Chase customer, Ms. Baydid offered to investigate the matter and indicated that she would contact Mr. Rogers once she had more information. (*See id.*) Ms. Baydid inquired with Chase corporate regarding the SFA designation, which required a review of the WaMu Records. (*Id.*)

Three days later, on February 8, 2010, Ms. Baydid met with Mr. Rogers to discuss the results of her investigation. (*Id.* ¶ 7.) She informed Mr. Rogers that pursuant to the WaMu Records, the SFA designation appeared to be associated with the deposit of a counterfeit check into the Account. (*Id.*) Ms. Baydid provided Mr. Rogers with copies of some of the WaMu Records, including several WaMu monthly statements for the Account, the signature card for the Account, and a copy of the Check deposited into the Account (collectively, "the Account Documents"). (*Id.* ¶ 7, Ex. A (Account Docs.).)[2] Mr. Rogers briefly reviewed the Account Documents and told Ms. Baydid that he did not open the Account. (*Id.* ¶ 8.) He also asked Ms. Baydid to arrange for Chase to remove the ChexSystems SFA designation associated with his social security number. (*Id.*)

---

[2] Exhibit A to Ms. Baydid's Declaration includes an internal Chase e-mail to Ms. Baydid which indicates, among other things, that her investigation into the Account was assigned ticket number 126175015. (Baydid Decl. Ex. A (Account Docs.) at 1.)

1    According to Mr. Rogers, Ms. Baydid agreed that the SFA designation was not his

2    fault, that Chase would take care of removing the designation, and that Mr. Rogers did

3    not have any liabilities or responsibilities.  (Rogers Dep. at 27-28.)  Mr. Rogers further

4    testified that Ms. Baydid suggested that he file an identity theft report, but he did not

5    recall her providing him with any documents or further instructions regarding removing

6    the SFA designation.  (*Id.*)  By contrast, Ms. Baydid testified that she provided Mr.

7    Rogers with a Chase identity theft packet and informed him that he would need to file an

8    identity theft claim with Chase before the SFA designation could be removed.  (Baydid

9    Decl. ¶ 8.)  She also testified that she encouraged him to file a police report and enclosed

10   a blank report with his identity theft packet.  (*Id.*)  According to Ms. Baydid, Mr. Rogers

11   took the documents she provided him when he left the Benson Center Branch on

12   February 8, 2010.  (*Id.*)  There is no dispute that Mr. Rogers did not file a police report or

13   identity theft claim during the remainder of 2010.  (*See* Rogers Dep. at 28; Baydid Decl.

14   ¶ 9.)

15           On February 23, 2010, and March 19, 2010, Mr. Rogers inquired with individuals

16   at a second Chase branch in Kent ("the West Smith Branch") regarding the SFA

17   designation, including manager Rebecca Nahaku.  (*See* Rogers Dep. at 28, 33-34; *see*

18   *also* Baydid Decl. Ex. D at 3.)  According to Mr. Rogers, the person he spoke with said

19   that she would not help him remove the SFA designation and gave him a number for

20   Chase's check forgery department but did not provide him with any other documents.

21   (*Id.* at 33.)  According to Chase's records, the individuals he spoke with told him that

22

they would not contact ChexSystems for him and that he had to contact ChexSystems directly.  (*See* Baydid Decl. Ex. D at 3.)

After Mr. Rogers's March 19, 2010 in-person meeting with a Chase representative, he called Chase's customer claims department, check forger department, deposit account recovery department, loss and fraud department, and escalations department.  (Rogers Dep. at 34.)  Mr. Rogers testified that some departments told him that they would look into the SFA designation and see if they could remove it, but he "never got anything back from them."  (*Id.*)

**D. Mr. Rogers's 2010 Inquiry to ChexSystems Regarding the Account**

On March 20, 2010, Mr. Rogers sent a letter to ChexSystems disputing the SFA designation associated with his name and social security number.  (1st Anderson Decl. Ex. B.)  On March 26, 2010, ChexSystems sent a letter to Mr. Rogers acknowledging receipt of his letter and notifying him that they had forwarded his request to the appropriate personnel for handling.  (2d Anderson Decl. (Dkt. # 28) Ex. B.)  Also on March 26, 2010, ChexSystems sent a request for reinvestigation to Chase ("the March 2010 Notice").  (*Id.* Ex. A.)

The March 2010 Notice lists the "source of information" as "JP Morgan Chase – Formerly WaMu."  (*Id.*)  It indicates that the reported name is "Neil J. Rogers," the reported address is in Chicago, and the reported social security number is Mr. Rogers's.  (*Id.*)  It also includes a driver's license number from Georgia and states that the original charge-off amount was $0.01.  (*Id.*)  The March 2010 Notice states that the report is for

suspected fraudulent activity and is disputed by the consumer. (*Id.*) The stated reason

for the reinvestigation was:

> Consumer disputes the above reported information and states that he was not aware of any fraudulent activity on this account[.] [He is also] requesting for any alleged signature, SSN, name, DOB or any other identifying information, which explain exactly how these documents justify this fraud information. Consumer states that he is not responsible in any way with the fraudulent activity. Please verify consumer dispute as mentioned . . . .

(*Id.*)

When Chase received the March 2010 Notice, it promptly reviewed its business

records regarding the Account, which included the WaMu Records and WaMu's

investigation regarding the Check. (Baydid Decl. ¶ 11.) In response to the March 2010

Notice, Chase informed ChexSystems, "We have a record of the Signature Card signed

by the customer when opening the account. There is no amount owed on the account.

Please delete the charge-off of $0.01." (2d Anderson Decl. Ex. C.) Chase further wrote,

"Please advise customer to file a claim [with] the Dispute Department at 866-564-2262.

Customer may request any documentation from there. Report is accurate and shall

remain." (*Id.*)

On March 31, 2010, ChexSystems sent a letter to Mr. Rogers stating that the

reported information had been changed to "Settled in full" at Chase's direction but that

Chase had verified the remaining information in the ChexSystems SFA report to be

accurate and complete. (1st Anderson Decl. Ex. D.) ChexSystems also informed Mr. Rogers that he could contact Chase at 1-877-287-7303 to obtain more information.[3] (*Id.*)

**E. Mr. Rogers's January 2011 Inquiries Regarding the Account**

In January 2011, Mr. Rogers attempted to open a checking account with another bank and was refused because of the SFA designation in the ChexSystems report. (Rogers Dep. at 38.) On January 25, 2011, Mr. Rogers visited the West Smith Branch and spoke with Branch Manager Diane Kremsner and Ms. Nahaku regarding why the SFA designation had not been removed. (*Id.* at 38-39.) According to Mr. Rogers, Ms. Nahaku told him that she could not remove the designation and that he would have to contact the fraud department, but Ms. Kremsner told him that it should have been taken care of and that she would look into it. (*Id.* at 39.) Mr. Rogers testified that Ms. Kremsner did not provide him with any instructions regarding what he needed to do, nor did she give him any documents. (*Id.*)

On January 27, 2011, Mr. Rogers sent a letter to ChexSystems again disputing the SFA designation. (1st Anderson Decl. Ex. E.) There is no evidence in the record that ChexSystems notified Chase of this dispute, and Ms. Baydid testified that she reviewed Chase's business records and that Chase has no record of receiving a notice from ChexSystems related to Mr. Rogers's January 2011 letter. (Baydid Decl. ¶ 12.) On February 2, 2011, however, ChexSystems responded to Mr. Rogers, stating that the

---

[3] This telephone number is different from the telephone number provided by Chase in its response to ChexSystems.

information related to the Account had been confirmed as accurate and complete.  (1st Anderson Decl. Ex. F.)

**F.  Mr. Rogers's Office of Comptroller of Currency Complaint**

On February 3, 2011, Mr. Rogers filed a written complaint with the Office of the Comptroller of Currency ("the OCC Complaint").  (Baydid Decl. ¶ 13, Ex. C.)  The OCC Complaint states in part:

> IN JANUARY 2010, I TRIED TO OPEN AN ACCOUNT AT A BANK (NOT CHASE).  THAT BANK SAID THEY COULD NOT OPEN AN ACCOUNT FOR ME BECAUSE I HAD A SUSPECTED FRAUD ACTIVITY REPORT ON MY NAME AND SS# IN THE CHEXSYSTEMS FILE.  THEY SAID THE ALERT WAS PUT ON BY WASHINGTON MUTUAL BANK.  WAMU WAS BOUGHT BY CHASE.  I HAD AN ACCOUNT IN JANUARY 2010 WITH CHASE. . . . I WENT TO CHASE BANK IN KENT, WASHINGTON AND ASKED THEM WHY I HAVE A FRAUD ALERT.  THEY SAID THAT I HAD DEFRAUDED CHASE OUT OF $36,400.00 . . . .  I HAD THEM GIVE ME A WRITTEN REPORT ON THE DETAILS.  THEY PRODUCED A COPY OF A FIFTH/THIRD BANK 12/27/06 CHECK FROM A ROBERT PETERSON (NEVER HEARD OF HIM) MADE OUT TO NEIL ROGERS (MY NAME).  THEY ALSO PRODUCED "WAMU FREE CHECKING STATEMENTS" FROM 12/05/06 THROUGH 04/03/07 DETAILING THE ACCOUNT'S ACTIVITY.  THE ACCOUNT WAS OPENED UNDER MY CORRECT NAME BUT AN INCORRECT DRIVER'S LICENSE NUMBER AND INCORRECT ADDRESS, PHONE NUMBER, AND DATE OF BIRTH.  THE SS# IS MINE. . . .

(*Id.* Ex. C.)  Mr. Rogers then detailed his attempts to have Chase and ChexSystems remove the SFA designation associated with his name and social security number.  (*Id.*)

On February 7, 2011, Chase received the OCC Complaint and promptly began an investigation ("the OCC Investigation").  (*Id.* ¶ 15, Ex. D.)  In the course of the OCC Investigation, members of Chase's Executive Office ("EO") reviewed Chase's business records regarding the Account, which included the WaMu Records, and communicated

1  with several branch employees, including Ms. Nahaku, Ms. Kremsner, and Ms. Baydid.

2  (*Id.* ¶ 15, Ex. D.)  Members of the EO also pulled up Mr. Rogers's social security number

3  and noted that he currently had an open Chase account.  (*Id.* Ex. D at 3.)  They also noted

4  that the signatures on the signature cards for the Account and Mr. Rogers's current

5  account were completely different and that the dates of birth were different.  (*Id.*)

6  Further, the EO members concluded that they would need a police report and a fraud

7  claim with Chase in order to assist with removing the SFA designation.  (*Id.* at 3-4.)  As

8  Mr. Rogers had not submitted either of these documents, Chase sent Mr. Rogers a letter

9  on February 16, 2011, notifying him that he would need to file a police report and an

10 identity theft claim with Chase's customer claims department.  (Baydid Decl. Ex. F.)

11 **G. Mr. Rogers's March 2011 Inquiry to ChexSystems Regarding the Account**

12      On March 29, 2011, Mr. Rogers sent a third letter to ChexSystems disputing the

13 SFA designation associated with the Account.  (1st Anderson Decl. Ex. G.)  On or about

14 April 5, 2011, ChexSystems sent Chase a request for reinvestigation ("the April 2011

15 Notice").  (*See* 2d Anderson Decl. Ex. E; Baydid Decl. ¶ 19.)  Upon receiving the April

16 2011 Notice, Chase reviewed its business records regarding the Account, which included

17 the WaMu Records associated with the Account, notes regarding the OCC Investigation,

18 and a letter from Mr. Rogers dated April 4, 2011, which formally reported that he had

19 been a victim of identity theft and attached a police report filed on March 2, 2011, an

20 affidavit attesting to the identity theft, and other relevant documentation.  (Baydid Decl.

21 ¶ 20, Ex. G.)  On April 22, 2011, Chase instructed ChexSystems to remove the record

22 associated with Mr. Rogers's name and social security number because there was no

suspected fraud activity.  (2d Anderson Decl. Ex. F.)  On April 24, 2011, ChexSystems

sent Mr. Rogers a letter confirming that the disputed information had been deleted from

his file.  (1st Anderson Decl. Ex. H.)

**H. Procedural History**

On October 11, 2011, Mr. Rogers filed the instant lawsuit against Chase.  (Compl.

(Dkt. # 1).)  Mr. Rogers alleges that Chase willfully or negligently violated the Fair

Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*., by failing to conduct a

reasonable investigation in response to Mr. Rogers's March 20, 2010 and January 27,

2011 letters to ChexSystems (Compl. ¶¶ 7.0-7.10, 10.0-10.6), failing to review all

relevant information provided by ChexSystems in both instances (*id.* ¶¶ 8.0-8.6, 11.0-

11.4), and failing to delete the inaccurate SFA designation in both instances (*id.* ¶¶ 9.0-

9.4, 12.0-12.4).  Mr. Rogers also alleges that Chase defamed him by making false

statements to ChexSystems.  (*Id.* ¶¶ 13.0-14.9.)  Mr. Rogers seeks actual, compensatory,

and/or punitive damages, as well as a letter of apology from Chase.  (*Id.* ¶¶ 15.0-15.2.)

On May 1, 2012, Chase filed the motion for summary judgment that is currently

pending before the court.  (Mot.)  On May 30, 2012, Mr. Rogers filed his response

(Resp.), and on June 1, 2012, Chase filed its reply, as well as a motion to strike Mr.

Rogers's untimely response (Reply).

### III.    ANALYSIS

**A. Chase's Motion to Strike**

Chase moves to strike as untimely Mr. Rogers's response to its motion for

summary judgment.  (Reply at 2.)  Chase argues that Mr. Rogers's response was five

days late and that, as a result, Chase had less than three days to prepare its reply. (*Id.*)

Although Chase is correct that Mr. Rogers's response was untimely, it was only one day

late. Mr. Rogers's response would have been due Monday, May 28, 2012, *see* W.D.

Wash. Local Rule CR 7(d)(3), except for the fact that May 28 was Memorial Day.

Pursuant to this court's scheduling order, if any of the dates identified by the Local Rules

fall on a federal holiday, the act shall be performed on the next business day. (Sched.

Ord. (Dkt. # 11) at 2.) Accordingly, Mr. Rogers's response brief was due by midnight on

Tuesday, May 29, 2012.

Mr. Rogers, however, filed his brief on the morning of Wednesday, May 30, 2012,

and therefore it was approximately 11 hours late. Although the court does not condone

Mr. Rogers's failure to comply with the court's well established local rules governing

motion practice, it deems it important to consider the arguments and evidence submitted

by Mr. Rogers and thus exercises its discretion to accept his response. The court further

notes that although Chase lost a few hours in which to draft its reply brief, Chase has not

been prejudiced by Mr. Rogers's untimely response and was able to timely file a reply

brief and additional supporting evidence. For these reasons, the court denies Chases'

motion to strike (Dkt. # 27).

**B. Chase's Motion for Summary Judgment**

**1. Summary Judgment Standard**

Summary judgment is appropriate if the evidence, when viewed in the light most

favorable to the non-moving party, demonstrates "that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the initial burden of showing that there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets his or her burden, then the non-moving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial" in order to withstand summary judgment. *Galen*, 477 F.3d at 658. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### 2. Mr. Rogers's Fair Credit Reporting Act Claims

Chase moves for summary judgment on Mr. Rogers's claims that it violated the FCRA. (Mot. at 12-19.) "Congress enacted the [FCRA] in 1970 'to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy.'" *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1153 (9th Cir. 2009) (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007)). Section 1681s–2 of the FCRA imposes two responsibilities on sources that provide credit information to CRAs. These sources are called "furnishers" under the statute. *Gorman*, 584 F.3d at 1153. First, a furnisher must provide accurate information. 15 U .S.C. § 1681s–2(a). Second, a furnisher must investigate and/or correct inaccurate information. 15 U.S.C. § 1681s–

2(b). The duties to investigate and correct inaccurate information are triggered only

"'upon notice of dispute'—that is, when a person who furnished information to a CRA

receives notice from the CRA that the consumer disputes the information." *Gorman*, 584

F.3d at 1154. "[N]otice of a dispute received directly from the consumer does not trigger

furnishers' duties under subsection (b)." *Id.*

Section 1681s–2(b) provides that, after receiving a notice of dispute, the furnisher

shall:

(A) conduct an investigation with respect to the disputed information;

(B) review all relevant information provided by the [CRA] pursuant to section 1681i(a)(2) . . . ;

(C) report the results of the investigation to the [CRA];

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other [CRAs] to which the person furnished the information . . . ; and

(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1) . . . (i) modify . . . (ii) delete . . . [or] (iii) permanently block the reporting of that item of information [to the CRAs].

15 U.S.C. § 1681s–2(b). "The FCRA expressly creates a private right of action for

willful or negligent noncompliance with its requirements." *Gorman*, 584 F.3d at 1154.

This right of action, however, is limited to claims arising under § 1681s–2(b). *Id.* "A

private litigant can bring a lawsuit to enforce § 1681s–2(b), but only after reporting the

dispute to a CRA, which in turn reports it to the furnisher." *Nelson v. Chase Manhattan

Mortgage Corp.*, 282 F.3d 1057, 1059–60 (9th Cir. 2002). Duties imposed under §

1681s–2(a), by contrast, are enforceable only by federal or state agencies. 15 U.S.C. §

1681s–2(d).  Furthermore, the FCRA provides that a party may recover actual damages

for negligent violations of the statute, 15 U.S.C. § 1681*o*, and both actual and punitive

damages for willful violations of the statute, 15 U.S.C. § 1681n(a).

A furnisher's investigation of a dispute pursuant to § 1681s–2(b)(1)(A) must be

reasonable.  *Gorman*, 584 F.3d at 1157.  The burden of showing that the investigation

was unreasonable is on the plaintiff.  *See id.*  The furnisher's duty to conduct a reasonable

investigation arises when it receives a notice of dispute from a CRA.  *Id.*  "Such notice

must include 'all relevant information regarding the dispute that the [CRA] has received

from the consumer.'"  *Id.* (quoting 15 U.S.C. § 1681i(a)(2)(A)).  Thus, "the pertinent

question is . . . whether the furnisher's procedures were reasonable in light of what it

learned about the nature of the dispute from the description in the CRA's notice of

dispute."  *Id.* (citing *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir.

2005) (holding that the furnisher's investigation in that case was reasonable given the

"scant information" it received from the CRA regarding the nature of the consumer's

dispute)).  Although reasonableness is normally a question for the finder of fact,

summary judgment is appropriate "when only one conclusion about the conduct's

reasonableness is possible."  *Id.*

Chase makes several arguments in support of summary judgment.  First, it

contends that it is not a "furnisher" within the meaning of the FCRA because it did not

report the suspected fraud to ChexSystems.  (Mot. at 12-13.)  Second, it argues that even

if it could be held liable under the FCRA, there is no evidence upon which a reasonable

jury could conclude that its investigations were unreasonable in light of the scant

1  information provided to it by ChexSystems. (*Id.* at 16-19.) Third, Chase asserts that

2  regardless of whether its investigations were unreasonable, Mr. Rogers has no evidence

3  supporting an award of actual, consequential, or punitive damages, and therefore

4  summary judgment is proper. (*Id.* at 20-23.) For the reasons described in detail below,

5  the court concludes that (1) under the circumstance of this case, Chase is a "furnisher"

6  within the meaning of the FCRA, (2) material issues of fact preclude summary judgment

7  on whether Chase's March 2010 investigation was unreasonable, (3) Chase is entitled to

8  summary judgment on any claim that it violated the FCRA in January or February 2011,

9  (4) material issues of fact preclude summary judgment on whether Mr. Rogers suffered

10  damages for any negligent failure by Chase to comply with the FCRA, and (5) there is no

11  evidence in the record to suggest that any failure by Chase to comply with the FCRA was

12  willful, and therefore it is entitled to summary judgment on Mr. Rogers's damages claim

13  under 15 U.S.C. § 1681n(a). In short, the court grants in part and denies in part Chase's

14  motion for summary judgment with respect to Mr. Rogers's FCRA claims.

15  **a. Chase as a "Furnisher"**

16  The FCRA does not define the meaning of the term "furnisher," however the

17  Ninth Circuit has described "furnishers" as the "sources that provide credit information to

18  the CRAs." *Gorman*, 584 F.3d at 1153; *see also Ransom v. Equifax Inc.*, No. 09-80280-

19  CIV, 2010 WL 1258084, at *4 (S.D. Fla. Mar. 30, 2010) ("Basically, the term 'furnisher

20  of information' is generally understood to include various types of creditors, such as

21  banks and other lenders, that provide credit information about their customers to other

22  entities that issue consumer reports about the customers' credit worthiness." (internal

citation and quotation omitted)); *Alam v. Sky Recovery Servs., LTD.*, No. H-08-2377, 2009 WL 693170 (S.D. Tex. Mar. 13, 2009) (noting that courts have defined the term "furnisher" to mean "an entity which transmits information concerning a particular debt owed by a consumer to a consumer reporting agency") (citation omitted)).

Chase argues that it is not a "furnisher" because it did not provide the information to ChexSystems that was disputed by Mr. Rogers—WaMu did. (Mot. at 11.) Chase further asserts that it did not assume any liability as a "furnisher" under the Agreement because WaMu closed the Account in January 2007 and reported the suspected fraud activity to ChexSystems in April 2007, over one year before Chase acquired certain WaMu assets and liabilities under the Agreement. (*Id.*) To support this contention, Chase relies on the provision of the Agreement that states that Chase "purchased all of the liabilities of [WaMu] which are reflected on the Books and Records of [WaMu] as of the Bank Closing."[4] (Agreement § 2.1.)

The court agrees with Chase that Washington Mutual was the original source of the SFA designation in connection with Mr. Rogers's name and social security number, and therefore it is a "furnisher" under the FCRA. Nevertheless, contrary to Chase's arguments, Chase assumed responsibility as a "furnisher" in this case under the terms of the Agreement. The Agreement provides in relevant part: "[Chase] shall have the

---

[4] Chase also argues that it is not liable as a "furnisher" because the FDIC agreed to indemnify and hold Chase harmless under the Agreement. (Mot. at 5, 12 (citing Agreement § 12.1).) Whether the FDIC must indemnify Chase, however, is irrelevant to the court's determination of Chase's status as a "furnisher." Chase is free to pursue a indemnity claim against the FDIC if appropriate, but that claim is not at issue here.

primary responsibility to respond to subpoenas, discovery requests, and other similar

official inquiries with respect to the Records of which it has custody." (Agreement § 6.3;

*see also id.* at 6 (defining "record" as "any document, microfiche, microfilm and

computer records . . . of [WaMu] generated or maintained by [WaMu] that is owned by

or in the possession of the [FDIC] at Bank Closing").) The undisputed evidence

establishes that Chase had custody of the WaMu Records. (*See* Baydid Decl. ¶ 6, Ex. A.)

Therefore, under § 6.3 of the Agreement, Chase had the primary responsibility to respond

to the ChexSystems requests regarding the Account. Accordingly, the court concludes

that Chase is a "furnisher" under the FCRA for the purposes of this case.

### b. Reasonableness of Chase's Investigation

In light of the court's conclusion that Chase is a "furnisher," it must address

Chase's next arguments regarding the reasonableness of its investigations. Mr. Rogers

brings two sets of FCRA claims: (1) those that center on his March 20, 2010 dispute

letter to ChexSystems and ChexSystems's March 2010 Notice to Chase, and (2) those

that involve a dispute letter that he sent to ChexSystems on January 27, 2011. (*See*

Compl. ¶¶ 7.0-12.4.) The court addresses each set of claims in turn.

### i. Mr. Rogers's March 20, 2010 Letter of Dispute

With respect to Mr. Rogers's claims that Chase violated the FCRA in March 2010,

the court concludes, for the reasons set forth below, that genuine issues of material fact

preclude summary judgment regarding whether Chase's investigation was unreasonable.

Chase argues that its investigation in response to the March 2010 Notice was reasonable

in light of the scant information provided by ChexSystems. (Mot. at 16-18; Reply at 9-

12.)  Chase contends that the March 2010 Notice failed to provide any information regarding the nature of Mr. Rogers's dispute, and did not contain any reference to identity theft, state that Mr. Rogers did not open the Account, or state that Mr. Rogers did not deposit the Check deemed fraudulent by WaMu.  (Mot. at 18.)  Chase further asserts that given that Chase's records at the time contained no written claim alleging identity theft, a police report, or any other written report alleging that the Account was opened fraudulently, Chase acted reasonably in simply verifying the accuracy of the SFA designation upon confirming that the Check was fraudulent.  (*Id.*)

As an initial matter, the court disagrees with Chase's assertion that the March 2010 Notice failed to provide any notice of the nature of Mr. Rogers's dispute.  Rather, the March 2010 Notice indicated:  "Customer states that he is not responsible in any way with the fraudulent activity."  (2d Anderson Decl. Ex. C.)  Therefore, although the March 2010 Notice did not contain specific allegations of identity theft, it plainly indicated that Mr. Rogers contested the association between himself and any fraudulent activity.  In response to the March 2010 Notice, the record indicates that Chase reviewed the WaMu Records and the records regarding WaMu's investigation regarding the Check.  (Baydid Decl. ¶ 11.)

If Mr. Rogers had not reported the identity theft orally to branch managers at Chase, the court would have little difficulty concluding that Chase's investigation was reasonable as a matter of law.  Mr. Rogers, however, contacted Ms. Baydid and other

Chase employees[5] to orally dispute the SFA designation, and Ms. Baydid opened a ticket

to investigate his dispute (*see* Baydid Decl. Ex. A at 1). Ms. Baydid also knew that Mr.

Rogers had an account history with Chase since 2005, and a cursory comparison between

Mr. Rogers's account and the Account would have indicated that a number of identifiers

did not match, such as the driver's license numbers, dates of birth, addresses, telephone

numbers, and signatures. (*See* Baydid Decl. Ex. D at 3; *see also* Resp. at 9, 13, 17-18.)

Although this information may not have been enough for Chase to remove the SFA

designation from the ChexSystems report, it could have prompted additional

investigation by Chase and/or communication between Chase and Mr. Rogers[6] that

would have assisted Mr. Rogers in taking the appropriate steps that would have led to the

removal of the SFA designation.[7] Whether Chase's investigation was procedurally

---

[5] Questions of fact exist regarding whether Ms. Baydid's and/or other Chase employees' knowledge of Mr. Rogers's dispute is imputed on Chase. *See Denaxas v. Sandstone Court of Bellevue, LLC*, 63 P.3d 125, 130 (Wash. 2003) ("In order for an agent's knowledge to be imputed to the principal, an agent must have actual authority in connection with the subject matter either to receive it, to take action upon it, or to inform the principal or some other agent who has duties in regard to it." (internal quotation and citation omitted)). For purposes of this motion for summary judgment, the court views the evidence in the light most favorable to Mr. Rogers and assumes that Ms. Baydid had actual authority as a branch manager to collect information from Mr. Rogers regarding his dispute and to conduct an investigation.

[6] The court recognizes that furnishers are not "automatically" required to contact every consumer who disputes a debt. *Westra*, 409 F.3d at 827. *Westra*, however, does not stand for the proposition that there are no circumstances under which a furnisher may be required to contact a consumer in order to conduct a reasonable investigation. *See id.*

[7] Chase argues that its employees repeatedly told Mr. Rogers that he needed to file a police report and Chase fraud claim to remove the SFA designation. Nevertheless, viewing the evidence in the light most favorable to Mr. Rogers, as the court must on summary judgment, the evidence establishes that, at best, Mr. Rogers received conflicting information from Chase prior to the March 2010 Notice regarding what steps he needed to take to remove the SFA designation.

1 reasonable in light of these facts is for the finder of fact to resolve, not the court on

2 summary judgment.

3       The three cases Chase primarily relies upon do not dictate a different outcome.

4 The Ninth Circuit's decision in *Gorman*, 584 F.3d at 1161, is distinguishable because

5 there, the furnisher reviewed all of the pertinent records in its possession, *id.*, whereas

6 here, Chase did not review Ms. Baydid's ticket or incorporate her knowledge of Mr.

7 Rogers's dispute into its investigation. Whether Chase's investigation was unreasonable

8 because of these omissions is an issue for the finder of fact. The Seventh Circuit's

9 decision in *Westra*, 409 F.3d at 827, is also distinguishable because the CRA's notice of

10 dispute to the furnisher contained no reference to fraud or identity theft, *id.*, whereas in

11 this case the March 2010 Notice indicated that Mr. Rogers maintained that he was not

12 responsible for any fraudulent activity associated with the account. Indeed, the *Westra*

13 court suggested that had the CRA given the furnisher "notice that the nature of the

14 dispute concerned fraud," summary judgment may not have been proper because "then

15 perhaps a more thorough investigation would have been warranted." *Id.* Finally, the

16 decision in *Noel v. First Premier Bank*, No. 3:12-CV-50, 2012 WL 832992 (M.D. Pa.

17 Mar. 12, 2012), a case that was decided on a motion to dismiss, does not assist this court

18 because it involved a question not raised here: whether the plaintiff had submitted a bona

19 fide dispute to the furnisher such that the furnisher was required to notify the CRA that

20 the CRA's report was disputed. *See id.*

21       In sum, the court concludes that Mr. Rogers has established that genuine issues of

22 material fact preclude summary judgment regarding whether Chase violated the FCRA

during its investigation in response to the March 2010 Notice. Accordingly, Chase's motion for summary judgment is denied as to these issues.

### ii.     Mr. Rogers's January 27, 2011 Letter of Dispute

With respect to Mr. Rogers's claims that Chase violated the FCRA in January or February 2011, the court concludes, for the reasons described below, that Chase is entitled to summary judgment. As noted above, a furnisher's duties to investigation and correct inaccurate information are triggered only upon notice of a customer's dispute that comes directly from a CRA. *Gorman*, 584 F.3d at 1154. Further, it is the plaintiff's burden to establish the unreasonableness of an investigation following receipt of a dispute notice from the CRA. *Id.* at 1157. Here, Chase has presented evidence that it never received notice of dispute from ChexSystems in response to Mr. Rogers's January 27, 2011 letter to ChexSystems. (Baydid Decl. ¶ 12; *see also* 2d Anderson Decl. ¶ 4.) As Chase's receipt of a notice of a dispute from ChexSystems is a prerequisite to its obligations to investigate and correct inaccurate information, Chase has satisfied its initial burden on summary judgment of showing the absence of an essential element of Mr. Rogers's claim. *See Celotex*, 477 U.S. at 323.

Mr. Rogers attempts to create a genuine issue of material fact as to whether Chase received a notice of dispute from ChexSystems by pointing to the February 2, 2011 letter he received from ChexSystems, which stated that Chase requested that ChexSystems change certain information related to the Account and then verified the remainder of the ChexSystems report as accurate. (Resp. at 14; 1st Anderson Decl. Ex. F.) When read in its entirety, however, the February 2, 2011 letter is insufficient to support a jury verdict in

Mr. Rogers's favor that Chase received a notice of dispute from ChexSystems in 2011. The letter begins: "*As stated in our previous correspondence, dated March 31, 2010*, this letter is to inform you that the reinvestigation of information contained in your consumer file at ChexSystems is complete."  (1st Anderson Decl. Ex. F (italics added).)  The next two paragraphs of the letter then quote verbatim the March 31, 2010 letter, including the statements that Chase directed ChexSystems to change the reported information to "settled in full" but otherwise verified the accuracy and completeness of the report.  (*Id.*)

The introductory language of the February 2, 2011 letter italicized above and the verbatim quotation of the March 31, 2010 letter contradict Mr. Rogers's assertion that the February 2, 2011 letter indicates that ChexSystems sent Chase a second notice of dispute. Importantly, if ChexSystems were reporting the result of a new reinvestigation by Chase, it would not have included Chase's directive that ChexSystems change the report to "settled in full" because this change was made in March 2010.  Indeed, if ChexSystems were reporting the result of a new reinvestigation by Chase, it would not have indicated that Chase verified the information to be accurate and complete "[w]ith this change" regarding the "settled in full" notation.  Even when viewed in the light most favorable to Mr. Rogers, the February 2, 2011 letter is insufficient to establish a material question of fact regarding whether ChexSystems notified Chase of Mr. Rogers's January 27, 2011 letter of dispute.  Accordingly, Chase is entitled to summary judgment on the issue of whether it violated the FCRA in January or February 2011.

### c. Damages for Negligent Non-Compliance

Chase next moves for summary judgment on Mr. Rogers's claim that he is entitled to actual damages for Chase's negligent non-compliance with the FCRA, as provided for under 15 U.S.C. § 1681*o*.  (Mot. at 21-23.)  Specifically, Chase argues that Mr. Rogers "(1) has made no effort to calculate actual or consequential damages, (2) provided no evidence of actual damages, and (3) confirmed that he has incurred no actual or consequential damages as a result of the SFA designation . . . aside from vague allegations regarding anxiety, humiliation and stress."  (*Id.* at 22.)  In response, Mr. Rogers has submitted a declaration detailing his emotional distress damages.  (*See generally* Rogers Decl. (Dkt. # 26-2).)

"The term 'actual damages' has been interpreted to include recovery for emotional distress and humiliation."  *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (reversing district court's grant of summary judgment where claimed emotional damages could have resulted from defendant's negligent failure to comply with the FCRA); *see also Dennis v. BEH-1, LLC*, 520 F.3d 1066, 1069 (9th Cir. 2008) (reversing district court's grant of summary judgment where plaintiff provided "credible evidence of actual damages," which included claims of emotional distress).  Accordingly, the court concludes that Mr. Rogers's declaration claiming that he suffered emotional distress as a result of Chase's alleged failure to comply with the FCRA creates a genuine issue of material fact regarding whether he suffered actual damages.  The court therefore denies Chase's motion for summary judgment on the issue of whether Mr. Rogers is

entitled to actual damages for any negligent failure to comply with the FCRA on Chase's part.

### d. Damages for Willful Non-Compliance

Chase moves for summary judgment on Mr. Rogers's claim that he is entitled to actual and punitive damages arising from Chase's willful non-compliance with the FCRA, as authorized by 15 U.S.C. § 1681n(a). (Mot. at 20-21.) "Willful" violations of the FCRA can be based on either a "knowing" or "reckless" basis. *Burr*, 551 U.S. at 56-60. A company subject to the FCRA acts with reckless disregard if (1) the action is a violation under a reasonable reading of the statute's terms, and (2) "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69; *see also Van Veen v. Equifax Info.*, No. 10-01635, 2012 WL 556063, at *9 (E.D. Pa. Feb. 14, 2012). Here, although the evidence may support a finding that Chase negligently failed to conduct a reasonable investigation in response to the March 2010 Notice, it is insufficient to support a jury verdict that Chase knowingly or recklessly violated the FCRA. *See Burr*, 551 U.S. at 56-60. Accordingly, the court grants Chase's motion for summary judgment on Mr. Rogers's claim for actual and punitive damages pursuant to 15 U.S.C. § 1681n(a).

\\

\\

\\

### 3. Mr. Rogers's Claim for Defamation

Finally, Chase moves for summary judgment on Mr. Rogers's claim that Chase made false statements to ChexSystems between February 5, 2010 and April 7, 2011.[8] (Mot. at 19-20; *see also* Compl. ¶¶ 13.0-14.9.) As an initial matter, as discussed above, the evidence in the record establishes that Chase responded to ChexSystems's March 2010 Notice but did not send a similar communication to ChexSystems any time after March 2010. According, Chase is entitled to summary judgment as it relates to Mr. Rogers's defamation claim for any statement made after March 2010. The court now turns to Mr. Rogers's claim that Chase's response to the March 2010 Notice was defamatory.

Under Washington law, to avoid summary judgment dismissal of a defamation claim, a plaintiff must make a prima facie showing of facts that would raise a genuine issue of material fact as to each of the following elements: (1) falsity, (2) an unprivileged communication, (3) fault, and (4) that the communication proximately caused damages. *Mark v. Seattle Times*, 635 P.2d 1081, 1089 (Wash. 1981); *see also Mohr v. Grant*, 108 P.3d 768, 776 (Wash. 2005). A plaintiff must establish each element with convincing clarity. *Mark*, 635 P.2d at 1089. The court addresses each element below and ultimately concludes that questions of fact preclude summary judgment on Mr. Rogers's defamation claim related to Chase's response to the March 2010 Notice.

---

[8] Chase does not argue that Mr. Rogers's defamation claim is preempted in any way by the FCRA, and accordingly the court does not consider the impact, if any, of the FCRA on Mr. Rogers's defamation claim.

### a. Falsity

The central dispute between the parties is whether Mr. Rogers can establish the falsity of Chase's statements to ChexSystems contained in its response to the March 2010 Notice.  (*See* 2d Anderson Decl. Ex. C.)  Chase relies on *Mohr*, 108 P.3d at 768, to argue that it need only show that the "sting" of the statement is true, and that the "sting" in this case was that a fraudulent check had been deposited into the Account.  (Mot. at 19-20.)  Because there is no dispute that the Check was fraudulent, Chase maintains that it is entitled to summary judgment on Mr. Rogers's defamation claim.  For his part, Mr. Rogers contends that Chase's failure to instruct ChexSystems to delete the SFA designation associated with his name amounted to a false statement.  (Resp. at 6.)

Chase's arguments regarding the "sting" of the statement are more appropriately analyzed as a part of Mr. Rogers's prima facie case of damages, therefore the court will discuss these arguments later in this order.  *See Herron v. KING Broad. Co.*, 776 P.2d 98, 102 (Wash. 1989) (requiring "the plaintiff to show that the falsehood affects the 'sting' of a report as part of his showing of damage").  Rather, to establish the first element of defamation, "the plaintiff must show the statement is provably false, either in a false statement or because it leaves a false impression."  *Mohr*, 108 P.3d at 775.  As noted above, the March 2010 Notice stated that "[c]onsumer disputes the above reported information . . ." and "states that he is not responsible in any way with the fraudulent activity."  (2d Anderson Decl. Ex. C.)  ChexSystems then asked Chase to "verify consumer dispute as mentioned . . . ."  (*Id.*)  Chase responded:  "Report is accurate and shall remain."  (*Id.*)  Although the ChexSystems report associated with Mr. Rogers's

name and social security number accurately reflected the contents of the WaMu Records

and the result of WaMu's investigation regarding whether the Check was fraudulent, it

did not accurately reflect that Mr. Rogers was not in fact responsible for any fraud.

Therefore, because Chase confirmed that the ChexSystems report, which included the

SFA designation, was accurate despite the consumer's correct statement that "he is not

responsible in any way with the fraudulent activity" (*id.*), a reasonable jury could

conclude that Chase's response to the March 2010 Notice contained a false statement or

left a false impression. As such, Mr. Rogers has satisfied his burden of creating a

genuine issue of material fact on the first element of his defamation claim.

### b. Unprivileged Communication

The parties do not dispute that Chase's response to the March 2010 Notice was

unprivileged, therefore summary judgment is not proper on this ground.

### c. Fault

The standard of fault in defamation cases depends on whether the plaintiff is a

public or private figure. *LaMon v. Butler*, 770 P.2d 1027, 1029 (Wash. 1989). "If the

plaintiff is a public figure or public official, he must show actual malice. If, on the other

hand, the plaintiff is a private figure, he need only show negligence." *Id.* Here, it is

undisputed that Mr. Rogers is a private figure, therefore to survive summary judgment on

this issue he must establish a genuine issue of material fact regarding whether Chase

acted negligently. As discussed above with respect to Mr. Rogers's FCRA claim, there

are genuine issues of material fact regarding whether Chase conducted a reasonable

investigation in response to the March 2010 Notice in light of its failure to consider Mr.

1 Rogers's oral communications with Ms. Baydid and the ticket that Ms. Baydid generated

2 during her investigation into the ChexSystems SFA designation. These genuine issues of

3 material fact similarly preclude summary judgment on the question of whether Chase

4 acted negligently in allegedly making a false statement to ChexSystems in response to the

5 March 2010 Notice.

6      **d. Proximate Cause of Damages**

7      With respect to the final element of defamation, the question, on which the

8 plaintiff has the burden of bringing forth triable issues of fact, "is whether the false

9 statement has resulted in damage which is distinct from that caused by true negative

10 statements also contained in the same report." *Herron*, 776 P.2d at 103; *see also Mohr*,

11 108 P.3d at 775. Washington courts do "not require a defamation defendant to prove the

12 literal truth of every claimed defamatory statement." *Mohr*, 108 P.3d at 775. Rather, "[a]

13 defendant need only show that the statement is substantially true or that the gist of the

14 story, the portion that carries the 'sting,' is true." *Id.* (quoting *Mark*, 635 P.2d at 1092).

15 "The 'sting' of a report is defined as the gist or substance of a report when considered as

16 a whole." *Id.* (quoting *Herron*, 776 P.2d at 102). "Where a report contains a mixture of

17 true and false statements, a false statement (or statements) affects the 'sting' of a report

18 only when 'significantly greater opprobrium' results from the report containing the

19 falsehood than would result from the report without the falsehood." *Herron*, 776 P.2d at

20 102.

21      As stated above, Chase contends that the "sting" of its statement to ChexSystems

22 was that a fraudulent check had been deposited into the Account. (Mot. at 20.) Yet

neither the March 2010 Notice nor Chase's response mention the fraudulent check. Rather, viewing Chase's communication to ChexSystems as a whole and the evidence in the light most favorable to Mr. Rogers, the court concludes that a reasonable jury could find that the "sting" was that Mr. Rogers was responsible for the SFA designation and that the designation was correct. Indeed, Mr. Rogers has submitted evidence that he was denied banking opportunities because of the SFA designation (*see generally* Rogers Decl.), and a reasonable jury could conclude that he was denied such opportunities because the SFA designation suggested that he was involved in bank fraud, not simply because a fraudulent check was deposited into his account. Mr. Rogers, moreover, has presented evidence sufficient to create a genuine issue of material fact regarding whether he sustained emotional damages as a result of false statements by Chase. (*See generally id.*) Accordingly, Mr. Rogers has presented sufficient evidence to create a genuine issue of material fact regarding whether false statements caused him harm that was distinct from any harm caused by the true portions of Chase's communication.

In sum, because Mr. Rogers has established genuine issues of material fact as to the elements of his common law defamation claim stemming from Chase's response to the March 2010 Notice, the court denies summary judgment on this claim.

\\

\\

\\

# IV.    CONCLUSION

For the foregoing reasons, the court DENIES Chase's motion to strike (Dkt. # 27) and GRANTS in part and DENIES in part Chase's motion for summary judgment (Dkt. # 21).

Dated this 13th day of June, 2012.

_____
JAMES L. ROBART
United States District Judge